**Opinion issued October 3, 2013.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-12-00271-CR**

————————————

**LEON THOMPSON III, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1212456**

---

**MEMORANDUM OPINION**

A jury convicted Leon Thompson, III, of capital murder and assessed punishment at life in prison.[1] Thompson appeals. He alleges, in three issues, that

---

[1]   *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West 2012).

the trial court erred in overruling his motion to suppress evidence. Concluding that any error in the admission of the challenged evidence was harmless, we affirm.

**Background**

In the early morning hours of April 8, 2009, three armed men entered the Black Widow Tattoo Parlor and robbed its three patrons. A tattoo artist who attempted to stop the robbery was shot and killed. The Houston Police Department's Homicide Division investigated the murder. As part of the investigation, detectives presented both live and photographic lineups of possible suspects to the patrons who witnessed the robbery and shooting. All three of the witnesses identified Teddrick Batiste in the live lineup, and one witness identified Thompson in the photo array.

At the conclusion of the investigation, a grand jury indicted Thompson for capital murder, alleging that, while in the course of committing or attempting to commit robbery, he intentionally caused the tattoo artist's death by shooting him with a firearm. At trial, Thompson moved to suppress photographs stored on memory cards that were found in his backpack, which was discovered during a search of Batiste's apartment.[2] The photographs depicted (1) Thompson holding a pistol that appeared to be the same caliber as the murder weapon and wearing a

---

[2]  Police recovered two backpacks belonging to Thompson during the search of Batiste's residence. Because only one of the backpacks contained the evidence subject to Thompson's motion to suppress, however, we refer to a single backpack in this opinion.

bandana around his neck, (2) Thompson with another gun—a revolver—and large amounts of cash, (3) pistols and large amounts of cash sitting on a table, and (4) Batiste driving a car that resembled one recorded fleeing from the tattoo parlor after the robbery and shooting. Thompson challenged the lawfulness of the search and seizure of his backpack and its contents on the grounds that detectives did not have a warrant or probable cause to search the backpack and Batiste's girlfriend, who consented to the search of the apartment where the backpack was found, could not authorize a search of property that did not belong to her.

Batiste's girlfriend, Stephanie Solis, testified to the circumstances surrounding the search and seizure of the backpack at the suppression hearing. She explained that she and Batiste lived together in a two-bedroom apartment with their children; however, Solis was the only person listed on the apartment lease. Thompson did not live in the apartment. Solis described Thompson as Batiste's friend who had visited the apartment a handful of times over a one- to two-week period and stayed overnight on at least one occasion. A little more than one week before the police searched Solis's apartment, Thompson had visited and left a backpack behind the couch in the living room. The backpack was not locked or otherwise secured, and Thompson did not tell Solis that the backpack or any of its contents were private. Thompson never returned to the apartment to retrieve the backpack because he and Batiste were arrested that same day on charges unrelated

3

to the murder. Detectives visited the apartment and obtained Solis's written consent to search the premises on the day Thompson was released from jail on the unrelated charges. Neither Batiste nor Thompson was present when the police searched the apartment. When the police discovered the backpack behind the couch, Solis informed the police that it belonged to Thompson.

Homicide Detective M. Miller, who was present for the search of the apartment, also testified at the suppression hearing. Miller acknowledged that he did not have a warrant to search the apartment or to search Thompson's backpack; however, he confirmed Solis's voluntary consent to the search. In the apartment, he observed the backpack belonging to Thompson in plain view laying against a living room wall. In the backpack, Miller found several items of clothing, a radar detector, a cell phone memory "SIM" card, and several photo memory "SD" cards. There was no personal identification, money, or credit cards in the backpack. Although the backpack did not contain any contraband, Miller seized it after learning that it belonged to Thompson. Miller conducted a more thorough review of the backpack's contents at the police station, including a review of the photographs contained on the SIM and SD cards. Miller testified that he did not realize the photographs contained on the memory cards might be evidence relevant to the murder investigation until after he looked at them.

After considering the suppression-hearing testimony and the argument of counsel, the trial court denied Thompson's motion to suppress. In addition to the photographs subject to Thompson's motion to suppress, the State presented the following evidence during the guilt-innocence phase of trial:

- One of the tattoo parlor patrons twice identified Thompson—once in a photo array and a second time in court—as one of the men who wielded a 9-millimeter weapon during the robbery and shooting at the tattoo parlor.

- Video surveillance from a business located in the same strip center showed a tan, four-door sedan pass by the tattoo parlor slowly before returning and backing into a parking space near the tattoo parlor's entrance. Detective Miller observed on the surveillance footage that the rear passenger side tire was missing part of its hubcap.

- Three individuals got out of the sedan and entered the tattoo parlor.

- Less than two minutes later, the sedan sped away from the tattoo parlor.

- Miller discovered that credit cards stolen from one of the tattoo parlor patrons were used multiple times at multiple locations, including a gas station.

- The gas station had video surveillance that showed a tan sedan with the same missing hubcap parked in the gas station parking lot around the time the credit cards were used there.

- Miller asked the gas station manager to keep a lookout for the sedan and to write down the license plate number if it showed up at the gas station again.

- Three days after the robbery and shooting at the tattoo parlor, the gas station manager contacted Miller to inform him that the tan sedan had shown up again. Although the tan sedan was no longer at the gas station when Miller arrived, the gas station manager had written down the

license plate number and had a video of the tan sedan and its two occupants.

- Stephanie Solis identified the two men in the new gas station surveillance footage as Batiste and Thompson.

- When Miller used the license plate number to search a vehicle database, he learned the sedan was registered to Batiste.

- Miller drove to Solis and Batiste's apartment, observed the sedan in the parking lot, ran a criminal history check on Batiste, and learned that he had been arrested following a traffic stop on the same day the gas station manager telephoned Miller.

- Thompson, who was a passenger in Batiste's sedan at the time of the traffic stop, was arrested for unlawfully carrying a handgun after he made furtive movements toward a 9-millimeter found under his passenger seat and was found to have a .22 caliber revolver stuffed in his waistband.

- The HPD Crime Scene Investigation unit recovered sixteen spent 9-millimeter shell casings from the crime scene and at least four fired bullets.

- Although not all of the casings were made by the same manufacturer, six of the casings were fired from the 9-millimeter found under Thompson's passenger seat during the traffic stop of Batiste's vehicle. One bullet fragment at the scene was also matched to the 9-millimeter.

The jury returned a guilty verdict, and Thompson appealed.

### Harmless Error and the Admission of Evidence

Thompson does not dispute that Solis's written consent authorized a search of her apartment and the seizure of evidence; rather, he contends that the authority to search the apartment did not extend to his backpack or its contents because (1) police did not have a warrant or probable cause to search the backpack, (2) he

6

did not intentionally abandon the backpack, and (3) Solis could not consent to a search of the backpack. Assuming, without deciding, that the admission of the photographs found on the memory cards seized from Solis's apartment violated Thompson's right to be free from unreasonable searches and seizures, we conclude that the trial court's failure to suppress the photographs was harmless error.

We review the harm resulting from a trial court's erroneous denial of a motion to suppress and subsequent admission of evidence obtained in violation of the Fourth Amendment under the harmless error standard found in rule 44.2(a). *See* TEX. R. APP. P. 44.2(a) (setting forth standard for reversible constitutional error); *Snowden v. State*, 353 S.W.3d 815, 817–18, 822 (Tex. Crim. App. 2011) (holding that when confronted with constitutional error, reviewing court must reverse judgment unless it can conclude beyond reasonable doubt that error did not contribute to defendant's conviction or punishment). We consider (1) the nature of the error, (2) the extent it was emphasized by the State, (3) the probable implications of the error, and (4) the weight the jury likely would have assigned to it in the course of deliberations. *See Snowden*, 353 S.W.3d at 822. These factors are not exclusive; other considerations may logically inform our harm analysis. *See id.* The Court of Criminal Appeals has emphasized, "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate

7

determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id.* (quoting TEX. R. APP. P. 44.2(a)).

The nature of the error here is the trial court's denial of a motion to suppress and subsequent admission of photographic evidence depicting Thompson with a weapon the same caliber as a weapon fired at the tattoo parlor. The probable implication of this evidence is that the jury could believe that the weapon belonged to Thompson, Thompson fired the weapon at the tattoo parlor, and thus Thompson committed capital murder while in the course of committing or attempting to commit robbery. The prosecutor discussed the photographs four times during trial—first when he asked Solis to identify Thompson in the photographs; second when he asked Miller to explain to the jury what the photographs depicted; and third when he asked a forensics expert whether the weapon in the photographs appeared to be the same as the weapon fired in the tattoo parlor. The fourth time the prosecutor mentioned the photographs was during closing, but the photographs were not the emphasis of his argument. He referenced the photographs on a single occasion.

Even though the photographs were prejudicial to Thompson, the risk that the photographs would move the jury from a state of non-persuasion to a state of persuasion was low. The jury's verdict was supported by overwhelming evidence. One of the tattoo parlor patrons testified that the armed man who robbed him was a

young black male who carried what appeared to be a 9-millimeter pistol. Although a bandana covered the lower part of the man's face, the patron observed teardrop tattoos around the man's eye. The patron identified Thompson—both in a photo array and in court—as the man with the 9-millimeter who pointed the weapon at him and stole his wallet. Thompson was arrested along with Batiste, whom all of the tattoo parlor patrons identified as the man who shot the tattoo artist, in the sedan that was observed in multiple surveillance videos from the tattoo parlor parking area and the gas station where the stolen credit cards were used. Stephanie Solis identified Thompson as one of the men in the gas station surveillance footage. Thompson was arrested after he made furtive movements toward a hidden 9-millimeter weapon that forensics tied to spent shell casings at the tattoo parlor.

Given the overwhelming weight of this evidence, we conclude that any error in the denial of the motion to suppress and subsequent admission of the photographs was not "reasonably likely to have caused such prejudice as to distract the jury or divert it from its proper fact-finding role." *See id.* at 825. We are persuaded to a level of confidence beyond a reasonable doubt that it did not contribute to the jury's determination that Thompson was guilty of capital murder. *See id.* Consequently, we hold that any error in the trial court denying appellant's motion to suppress was harmless error. *See* TEX. R. APP. P. 44.2(a).

We overrule Thompson's first, second, and third issues.

9

## Conclusion

Having concluded that the error in this case, if any, was harmless, we affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).